**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CARISSA L. THOMPSON,<br>4004 Alpha St.<br>Greenville, TX 75401<br><br>       Plaintiff,<br><br>  v.<br><br>LLOYD J. AUSTIN III, in his official capacity<br>as Secretary of Defense,<br>1000 Defense Pentagon<br>Washington, D.C. 20301-1000<br><br>FRANK KENDALL III, in his official capacity<br>as Secretary of the Air Force,<br>1670 Air Force Pentagon<br>Washington, D.C. 20330-1670<br><br>PHYSICAL DISABILITY BOARD OF<br>REVIEW<br>3351 Celmers Lane<br>Joint Base Andrews, MD 20762<br><br>      Defendants. | Case No.: _____<br><br><br>**COMPLAINT** |

## INTRODUCTION

1.    This is an action for declaratory and injunctive relief brought by Carissa L. Thompson ("Plaintiff" or "Ms. Thompson"), a former Airman First Class (A1C) in the United States Air Force (the "Air Force"), against Lloyd J. Austin III, in his official capacity as Secretary of Defense, Frank Kendall III, in his official capacity as the Secretary of the Air Force, and the Physical Disability Board of Review (the "PDBR") (collectively, the "Defendants"). As discussed below, the Defendants erroneously denied Ms. Thompson's application for disability retirement status based on a severe lower back injury that rendered her unfit for continued military service.

2.     Under Chapter 61 of Title 10, when a military department determines that a member of the U.S. Armed Forces, like the plaintiff, suffers from a disability that renders her unfit for duty, the department's Physical Evaluation Board ("PEB") assigns a disability rating (on a range from 0% to 100%) based on the Schedule for Rating Disabilities (the "VASRD"), 38 C.F.R. § 4.1, *et seq*, issued by the Department of Veterans Affairs (the "VA").  In 2008, based on the concern that the military departments had been underestimating disability ratings, Congress established the PDBR to conduct independent reviews of those determinations.  PDBR decisions are reviewed by the secretary of the servicemember's department, and that decision is final and not subject to further administrative review.

3.     Servicemembers who are assigned a disability rating of 30% or above are entitled to status as a "military retiree."  Servicemembers who receive a lower disability rating are deemed "medically separated."  The distinction is important because certain benefits are granted only to military retirees.  These include military health care (TRICARE) for the retiree and her family, and continuing military privileges, such as continued access to military bases, commissary privileges, the right to wear the uniform on appropriate public occasions, space-available travel on military aircraft, military funeral arrangements, and burial privileges at national cemeteries.

4.     In April 2005, the Air Force determined that Ms. Thompson's L1 vertebra compression fracture was unfitting and assigned her a 10% disability rating under Diagnostic Code 5235, 38 C.F.R. § 4.71a.  The Secretary of the Air Force approved that rating one week later, and Ms. Thompson was medically separated from the Air Force without a disability retirement.

5.     In the following months, the VA conducted a Compensation and Pension ("C&P") examination and assigned Ms. Thompson a disability rating of 40% for the same injury, L1 vertebra compression fracture, under Diagnostic Code 5235.  Following the establishment of the

2

PDBR, Ms. Thompson sought review of her prior PEB disability rating. Despite the VA's findings and other evidence, the PDBR recommended no change on April 29, 2016. That decision was subsequently approved by the Secretary of the Air Force on June 10, 2016.

6.     For the reasons explained below, the PDBR's decision to recommend against any change to Ms. Thompson's disability rating was arbitrary, capricious, contrary to law, and unsupported by substantial evidence. Specifically, the PDBR ignored clear evidence that according to the VASRD—which governs the PDBR's review of disability ratings—Ms. Thompson's medical condition warranted a 40% disability rating, which in turn entitled her to a medical retirement from the Air Force. The PDBR also acted in a manner contrary to law by failing to follow the VASRD. The PDBR is required by law to follow the VASRD strictly, and the VASRD requires *inter alia* that when reasonable doubt arises regarding the degree of disability, such doubt will be resolved in the favor of the veteran. 38 C.F.R. § 4.3. Moreover, if there is a question as to which of two evaluations must be applied, the higher evaluation must be assigned if the disability picture more nearly approximates the criteria required for the higher rating. 38 C.F.R. § 4.7. In approving the PEB's prior disability rating, the PDBR ignored these important laws governing its review.

7.     The PDBR's and the Air Force's failure to follow the law has deprived Ms. Thompson of a permanent disability retirement that would entitle her to medical retiree status and a host of non-monetary benefits that Ms. Thompson has earned through her honorable service.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case raises federal questions under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.*

9.      Ms. Thompson seeks declaratory and equitable relief in this action, namely, vacatur of the PDBR's decision and an order directing the Air Force to place Ms. Thompson on medical retirement status.  The PDBR denied Ms. Thompson's request for relief, and the Secretary of the Air Force accepted the PDBR's recommendation.

10.      The PDBR's ruling, upon confirmation by the Secretary, became a final agency action for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.

11.      Venue is proper under 28 U.S.C. § 1391(e)(1) because multiple Defendants reside in this district, and this Court is a "court of competent jurisdiction" under 5 U.S.C. § 703.

**PARTIES**

12.      Plaintiff Carissa L. Thompson is a citizen of the United States, a veteran of the United States Air Force, and a resident of Greenville, Texas.

13.      Defendant Lloyd J. Austin III is the Secretary of Defense.  He is the head of the Department of Defense, and exercises authority, direction, and control over the Department of Defense and the PDBR, which makes recommendations regarding veterans' disability status. Defendant Austin performs a significant amount of his official duties within this judicial district.

14.      Defendant Frank Kendall III is the Secretary of the Air Force.  He exercises authority, direction, and control over the Air Force, and he has the authority to review and accept the PDBR's recommendation.  Defendant Kendall performs a significant amount of his official duties within this judicial district.

15.      Defendant PDBR is a joint service review board.  The PDBR is located at Joint Base Andrews in Maryland.

## FACTUAL ALLEGATIONS

### Ms. Thompson's Air Force Service

16.     Ms. Thompson served honorably as an Airman First Class (E-3) in the United States Air Force as a Signals Intelligence Analyst from November 25, 2002, to May 23, 2005.

17.     Ms. Thompson joined the Air Force shortly after graduating from Mesquite High School, in Mesquite, TX, where she obtained her high school diploma in June 2002.  After joining the Air Force, Ms. Thompson was enrolled in an approximately six-month tech training program in or around 2003 at the Goodfellow Air Force Base ("AFB"), where she graduated at the top of her tech class.

18.     As a Signals Intelligence Analyst, Ms. Thompson's responsibilities entailed familiarizing herself with and tracking aircraft that would fly near U.S. nautical borders and alerting the appropriate commanders of any suspicious activity.

19.     Due to her exemplary service, Ms. Thompson was awarded an Air Force Organizational Excellence Award and a Global War on Terrorism Service Medal.

20.     Prior to her discharge, Ms. Thompson was stationed at Lackland AFB in Lackland, Texas, and earned and retained the rank of Airman First Class (E-3).

### The Air Force Disability Evaluation System

21.     Chapter 61 of Title 10 of the United States Code establishes the process through which the Armed Services discharges disabled service members.  It authorizes a Physical Evaluation Board ("PEB") to discharge military personnel who are found to be unfit for continued military service due to physical or mental disability.

22.     The process begins with the Medical Evaluation Board ("MEB").  Service members may not refer themselves to the MEB; the decision to begin proceedings before the MEB rests

entirely with the Air Force.  The MEB determines whether a service member has a condition that is duty-limiting for service.  If the MEB determines that a service member has one or more physical or mental conditions that fall below retention standards, then it refers the service member to a PEB.

23.     The PEB is responsible for determining a service member's fitness/unfitness for duty as a result of a physical or mental disability.  A finding of unfitness is required when a disability rises to the level of interrupting a service member's career.  If the PEB finds a service member is unfit for duty, then it must assign a percentage disability rating in accordance with the VASRD from 0% to 100%, in increments of 10%, for each condition.  10 U.S.C. § 1216a. A disability rating of 30% or higher qualifies the service member for a disability retirement.

24.     In response to concerns that the military departments were not accurately and consistently assigning disability ratings, in 2008, Congress established the PDBR as a new federal agency under the Wounded Warrior Act.  *See* Nat'l Def. Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3, tit. XVI, § 1601–1676.  As the Chairman of the Veterans' Disability Benefits Commission explained to the Committee on Armed Services and the Committee on Veterans' Affairs in 2007, the military departments frequently assigned lower disability ratings than the VA, even though both the VA and the military departments purportedly relied on the same disability rating criteria (*i.e.*, the VASRD).[1]  He further testified that, based on data collected by the Veterans' Disability Benefits Commission, it was "apparent that [the Department of Defense] has strong incentive to assign ratings less than 30% so that

---

[1]     HEARING TO RECEIVE TESTIMONY ON THE DEPARTMENT OF DEFENSE AND VETERANS AFFAIRS DISABILITY RATING SYSTEMS AND THE TRANSITION OF SERVICEMEMBERS FROM THE DEPARTMENT OF DEFENSE TO THE DEPARTMENT OF VETERANS AFFAIRS, S. Hrg. 110–212, at 104 (Apr. 12, 2007) ("While DOD asserts that it follows the VA Schedule for Rating Disabilities, the instructions issued by DOD and the Services, in effect, change the criteria contained [in] the Rating Schedule and how the Rating Schedule is applied.").

only separation pay is required and continuing family health care is not provided."[2]  During the legislative process, Senator Carl Levin of Michigan, then Chairman of the Armed Services Committee, acknowledged this ongoing problem and stated that the bill would establish "an independent board to review and, where appropriate, correct unjustifiably low Department of Defense disability ratings awarded since 2001."[3]

25.     The PDBR has jurisdiction to review the applications of veterans who were medically separated between September 11, 2001, and December 31, 2009, with a disability rating under 30%.  10 U.S.C. § 1554a(a)–(b).  Upon review, the PDBR makes recommendations to the service secretary concerning whether a determination should be confirmed or modified. *Id*.  The PDBR's decision may be accepted or rejected by the relevant service secretary. Department of Defense ("DoD") Instruction 6040.44.  The Secretary's decision is considered to be a final agency decision.  *See id.* at 7.

26.     Department of Defense ("DoD") Instruction 6040.44 governs the PDBR's review.  The instruction provides that "[t]he purpose of the PDBR shall be to reassess the accuracy and fairness of the combined disability ratings assigned Service members who were discharged . . . with a combined disability rating of 20 percent or less and were not found to be eligible for retirement."  DoD Instruction 6040.44 further requires the PDBR to "[u]se the VASRD in arriving at its recommendations, along with all applicable statutes, and any directives in effect at the time of the contested separation (to the extent they do not conflict with the VASRD in effect at the time of the contested separation)."  DoD Instruction 6040.44, Enclosure 3 § 4(d); *see also* 1.  The PDBR must strictly follow the VASRD, and may add criteria only "if the utilization of such criteria

---

[2]      *Id.* at 104.

[3]      153 Cong. Rec. S. 9857, 9858 (July 25, 2007).

will result in a determination of a greater percentage of disability than would be otherwise determined through the utilization of the schedule." 10 U.S.C. § 1216a(a)(2).

27.     The VASRD mandates that any reasonable doubt arising regarding the degree of the disability must be resolved in the veteran's favor and that where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating.  38 C.F.R. §§ 4.3, 4.7.  In addition, the VASRD requires that any disability examination like Ms. Thompson's, for which range of motion is at issue, must denote, among other things, the functional loss resulting from pain throughout the range of motion.  *See* 38 C.F.R. § 4.40 (defining "disability" as "the inability, due to damage or infection in parts of the [musculoskeletal] system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance" and noting that "functional loss . . . may be due to pain, supported by adequate pathology and evidenced by the visible behavior of the claimant undertaking the motion"); *see also* 38 C.F.R. § 4.59 ("The intent of the schedule is to recognize painful motion with joint or periarticular pathology as productive of disability.").  Where a medical examination report fails to denote functional loss due to pain, it is inadequate for rating purposes and "the adjudicator is required to "return the report as inadequate for evaluation purposes." 38 C.F.R. § 4.2 (1994); *see also DeLuca v. Brown,* 8 Vet. App. 202, 205–06 (1995) (rejecting Board's reliance on examination that "merely recorded the veteran's range of motion" without addressing functional loss due to pain upon motion).

### Ms. Thompson's In-Service Medical History and Discharge

28.     On July 31, 2003, shortly after her nineteenth birthday and just under nine months into her career, Ms. Thompson sustained a serious back injury while riding as a passenger on a

two-person all-terrain vehicle.  Ms. Thompson was thrown off the ATV and the ATV landed on top of her, causing an L1 compression fracture.

29.     Ms. Thompson was hospitalized for two weeks, placed in a large brace, and prescribed narcotics for her pain.  She suffered an L1 burst fracture, which caused severe back pain.[4]

30.     On September 4, 2003, Ms. Thompson was placed on a temporary physical "profile" due to her back condition.[5]  This meant that her duties were adjusted in response to the acknowledged physical limitations.  Ms. Thompson's profile indicated that she was not "worldwide qualified," meaning that she was not eligible for worldwide assignability or global deployment.  *See generally Frey v. United States*, 112 Fed. Cl. 337, 344 (2013).  Through December 7, 2003, Ms. Thompson was required to wear a back brace, including while sitting, standing, or walking.  She was also restricted from running, lifting, and prolonged standing.

31.     On September 15, 2003, Ms. Thompson's profile was upgraded to indicate that she was worldwide qualified, but she remained restricted from running, jumping, climbing, crawling, repeated bending, repeated twisting, engaging in ergometry testing, and engaging in sports.  Her

---

[4]     "A burst fracture is an injury in which the vertebra, the primary bone of the spine, breaks in multiple directions. . . .  A burst fracture usually results from significant trauma that compresses the bone, such as a motor vehicle accident or a severe fall. Burst fractures account for 14% of all spinal injuries."  Columbia University Irving Medical Center, BURST FRACTURE, https://www.neurosurgery.columbia.edu/patient-care/conditions/burst-fracture.

[5]     "Medical profiles are given to servicemembers who[ ] either injure themselves or have become ill and cannot perform all physical activities.  These profiles are used to recover from illness and injury, and limit the servicemember from performing physical tasks that could hinder their recovery."  Mariah Haddenham (Air Force Medical Service), SERVICEMEMBERS AND MEDICAL PROFILES (Oct. 31, 2012), https://www.airforce-medicine.af.mil/News/Display/Article/425922/servicemembers-and-medical-profiles/.

profile restricted her from lifting anything greater than 15 lbs. and standing more than 15 minutes per hour.

32.     On September 25, 2003, Ms. Thompson attended a Physical Therapy Consultation, where the examiner noted that the lumbosacral spine range of motion (sometimes referred to as "ROM") for the forward flexion could tolerate 15 degrees.[6]

33.     On October 21, 2003, Ms. Thompson attended an orthopedic spine appointment during which the examining physician noted that she was limited in flexion to 30 degrees before she experienced pain in the L5 region.[7]  The examiner noted that Ms. Thompson was taking four to six Vicodin per day and that she wore a back brace.  The examiner did not specify whether Ms. Thompson wore the brace during the exam.

34.     On October 31, 2003, Ms. Thompson's profile was downgraded to restrict her from working more than four hours per day and preclude her from running, high impact activity, strenuous activity, and any heavy lifting greater than 20 lbs.

35.     On April 1, 2004, Ms. Thompson's restrictions continued.  Her profile indicated that she was not worldwide qualified and restricted her to a four-hour duty day.  She was restricted from running and jumping.  She was not medically cleared for timed runs, push-up assessments, crunch assessments, ergometry assessments, or a one-mile walk test.  Ms. Thompson remained not worldwide qualified in her subsequent profiles up until her discharge in May 2005.

---

[6]     *See* National Institutes of Health, MedlinePlus Medical Encyclopedia, LUMBOSACRAL SPINE X-RAY (The lumbosacral spine" is the "lower part of the spine," including "the lumbar region and the sacrum, the area that connects the spine to the pelvis."), https://medline-plus.gov/ency/article/003807.htm.

[7]     The "L5" region is the lowest vertebrae of the lumbar spine.  Cleveland Clinic, SPINE STRUCTURE AND FUNCTION, https://my.clevelandclinic.org/health/articles/10040-spine-structure-and-function.

36.     On June 11, 2004, Ms. Thompson attended an orthopedic spine clinic appointment. The examiner noted that Ms. Thompson had been "weaned" off the use of a back brace and had a full range of motion at the time.  But the examiner also found that she remained in severe pain, and the examiner discussed potential surgical treatment options with Ms. Thompson.  Importantly, the examiner never noted where the pain began when taking range of motion measurements.

37.     The following month, following an examination on July 26, 2004, an Air Force Medical Examination Board (the "MEB") examiner evaluated Ms. Thompson.  Although the examiner found full range of motion for her spine, the examiner also noted that she suffered significant pain at the level of her L1 vertebra compression fracture.  The MEB examiner failed to note where Ms. Thompson's pain began when taking range of motion measurements.  The examiner noted that she was not fit for worldwide duty due to the pain caused by her compression fracture.  He assigned her a level 4 on the PULHES grading system for her lower extremities that also includes the lower back, which indicated that her condition was below the level of medical fitness required for service.[8]

38.     On October 1, 2004, Ms. Thompson's profile for her back continued to restrict her to a four-hour duty day and maintained her status as not worldwide qualified.  These restrictions continued as depicted in her profile on December 2, 2004, which further added that she was not medically cleared for unit physical training ("PT"), a timed run, a push-up assessment, a crunch assessment, and an ergometry assessment.

---

[8]     "[T]he 'PULHES' profile reflects the overall physical and psychiatric condition of the veteran's capacity and stamina ('P'); upper extremities ('U'); lower extremities ('L'); hearing ('H'); eyes ('E') and psychiatric condition ('S') assessed on a scale of 1 (high level of fitness) to 4 (a medical condition or physical defect which is below the level of medical fitness for retention in the military service)."  No. 09-27 741A, 2021 WL 6211003 (Bd. Vt. App. Nov. 1, 2021).

39.     On December 13, 2004, Ms. Thompson went to the Pain Medical Clinic where a medical examiner noted that she was limited to 20 degrees of forward flexion.  Further, the examiner noted that Ms. Thompson's pain was exacerbated by activity including walking and standing and that her pain had worsened over the past six months.  Shortly after the examination—in or around December 2004 and January 2005—Ms. Thompson was placed on convalescent leave due to her extreme back pain.

40.     On January 31, 2005, Ms. Thompson's profile for her back continued to restrict her to a four-hour duty day.  She was restricted from lifting anything over five pounds and she was not cleared for unit PT, a timed run, a push-up assessment, a crunch assessment, a walk test, or an ergometry assessment.

41.     Ms. Thompson attended another orthopedic clinic appointment on February 1, 2005.  The examiner noted that Ms. Thompson's pain continued, and worsened with activity, but did not make any finding with respect to her range of motion or where pain began in her range of motion at that time.  The examiner also reviewed potential surgical options.  Thereafter, Ms. Thompson attempted to reduce her pain medication dosage, but the reduction made her pain unmanageable.

42.     On February 17, 2005, as Ms. Thompson's back pain was increasing, the MEB referred Ms. Thompson to the PEB.  The following day, facing unbearable back pain, Ms. Thompson requested an increase in prescribed Fentanyl while she awaited possible back surgery.

43.     On April 6, 2005, the PEB confirmed the MEB's finding, and found Ms. Thompson unfit for duty due to her Compression Fracture L1 vertebra, under Diagnostic Code 5235, 38 C.F.R. § 4.71a.  The PEB assigned Ms. Thompson a rating of 10% for her condition.  Under code 5235, a rating of 10% is warranted for forward flexion of the spine greater than 60 degrees,

but less than 85 degrees. The result of Ms. Thompson's 10% disability rating was a medical separation with a severance payment, not a medical retirement or any of the attendant benefits of medical retirement.

44. On April 12, 2005, the Secretary of the Air Force approved the PEB's finding and directed Ms. Thompson's separation from the Air Force. *See* 10 U.S.C. § 1203. Ms. Thompson's separation became effective on May 23, 2005.

## Ms. Thompson's Post-Discharge Medical History

45. On August 3, 2005, Ms. Thompson attended a VA Compensation and Pension ("C&P") examination ("C&P Exam"). A C&P examination occurs if a service member files a compensation or pension claim and the VA relies on it to determine whether the disability is service-connected, the level of the disability, or whether the condition has worsened.[9]

46. At the exam, Ms. Thompson reported constant, stabbing pain in her back despite wearing a brace and taking narcotic pain medication. Further, at the exam, she was in a wheelchair and reported suffering from constant lower back pain, every day, for 24 hours. She explained that at times, she experienced "stabbing type pain," which "radiate[d] to both buttocks, to posterior legs, [and] to the knees." At her C&P exam, the examiner took range of motion measurements of Ms. Thompson's spine and noted that she was wearing a back brace. Despite indicating that it was difficult to examine Ms. Thompson because she was wearing a back brace, the examiner was able to take range of motion measurement sufficient for VASRD rating purposes and reported that she was "very limited in all ranges of motion." The examiner noted that Ms. Thompson's "[f]orward flexion goes from 0 to 30 degrees with pain in the entire lumbar spine at 30 degrees,

---

[9]     *See* VA Claim Exam Fact Sheet, https://www.benefits.va.gov/COMPENSATION/docs/claimexam-factsheet.pdf.

minus 60 degrees secondary to pain.".  Importantly, the examiner, as required by the VASRD, indicated that the Ms. Thompson suffered from 60 degrees of functional loss due to pain, limiting her range of motion effectively to 30 degrees.  Moreover, the examiner did not provide any indication that the back brace impaired these range of motion measurements.

47.     At the time of her August 2005 C&P exam, Ms. Thompson reported that she could not work because of her condition.  In fact, Ms. Thompson reported her physical activity was limited to walking to and from the bathroom, her pain had continued to worsen, and she had eight incapacitating episodes that past year.

48.     At the time, Ms. Thompson managed her back pain with different medications, including Morphine patches, Flexeril, Naproxen, and hydrocodone.

49.     The VA issued initial ratings on August 25, 2005, conferring a rating of 40% for residuals, L1 fracture under Diagnostic Code 5235, 38 C.F.R. 4.71a.  Under code 5235, a 40% rating is warranted for forward flexion of the thoracolumbar spine that is 30 degrees or less.  The rating was based on the available medical evidence, including Ms. Thompson's military medical records and the C&P Examination.

50.     Because of Ms. Thompson's incapacitating back condition and pain, she continued to seek care from the VA and from physical therapy.  On September 12, 2005, during a visit to a VA staff physician, she reported increased back pain despite the use of a fentanyl patch and requested a wheelchair since her condition significantly impaired her mobility.  At the time, although she had her own place of residence, she had to reside with a family member in her family member's residence due to the pain and debility.

51.     On October 7, 2005, during an appointment with a VA physical therapist, Ms. Thompson advised that her back pain had been getting worse and she had difficulty walking due

to the pain.  The physical therapist observed that Ms. Thompson could "benefit from [a front wheeled rolling walker] for ambulation for short distances and a manual [wheelchair] to enable [her] to have access into the community."

52.     On March 17, 2008, Ms. Thompson attended another C&P examination where the examiner found Ms. Thompson's flexion to be less than 10 degrees (more in the range of 5 degrees), with pain noted on all motions.  The VA retained the 40% rating for the condition.

**Physical Disability Board of Review**

53.     Following the passage of the Wounded Warrior Act, on November 19, 2013, Ms. Thompson requested that the PDBR review the discrepancy between her VA and PEB ratings. The PDBR reviewed the evidence that Ms. Thompson was medically separated for compression fracture L1 vertebra condition and, in a decision issued on June 10, 2016, recommended no change in the PEB finding of a disability rating of 10%.

54.     In reaching that decision, the PDBR relied on the July 2004 MEB examination and orthopedic spine examinations in June 2004 and February 2005.  The PDBR rejected the August 2005 and March 2008 C&P examinations and other examinations from September 25, 2003, October 21, 2003, and December 13, 2004, that clearly support a 40% rating.  The PDBR found that the 10% rating was appropriate based on the July 26, 2004 MEB examination, which concluded that Ms. Thompson had a full range of movement of the spine, even though this conclusion was made approximately *10 months* before her separation from the military, and even though the examination failed to comply with the VASRD because it did not mention where pain began upon movement.

55.     At least three other in-service examinations from September 25, 2003, October 21, 2003, December 13, 2004, as well as the VA examination in August 2005, contradicted the 10% disability rating.

56.     The PDBR decision considered the March 17, 2008 C&P examination, but the decision completely disregarded the examiner's actual range of motion finding during that exam and focused instead on the fact that "a recent magnetic resonance imaging showed a 50% compression fracture of L1, which was healed and stable."

57.     The PDBR found that the orthopedic examination conducted on February 1, 2005, which as noted above did not document Ms. Thompson's range of motion, supported the conclusion that her thoracolumbar spine was within functional limits.[10]

58.     In attempting to reconcile its findings with the August 2005 C&P exam, the PDBR determined that Ms. Thompson's range of motion "obtained while in a brace designed to restrict ROM was not useful for the purpose of providing a rating according to the VASRD and, therefore [the PDBR] placed greater probative value on the orthopedic exams in June 2004 and February 2005 for its rating recommendation." Yet the VA relied on this exam to award Ms. Thompson a 40% rating pursuant to the VASRD, and there was no indication in that finding that the back brace had prevented an accurate measurement. Moreover, the PDBR failed to discuss other evidence confirming that the ROM found during the August 2005 C&P exam was consistent with the March 2008 C&P examination and examinations from September 25, 2003, October 21, 2003, and December 13, 2004.

---

[10]     University of Southern California Spine Center, THORACOLUMBAR SPINE FRACTURES ("Thoracolumbar" refers to the "thoracic (middle) [and] lumbar (lower back) region of the spine."), https://www.uscspine.com/conditions-treated/back-disorders/thoracolumbar-spine-fractures/.

59.     The PDBR not only ignored those examinations, but also improperly relied on a June 11, 2004 orthopedic examination.  This exam indicated that she had a "full range of motion" at the time without indicating where in the range of motion the pain began.  This medical note is not probative of Ms. Thompson's disability because, although Mr. Thompson had been weaned off the back brace at the time, she later started wearing a brace again.  In other words, her condition had degenerated after this examination.  Moreover, this medical examination was only minimally probative of Ms. Thompson's condition at the time of separation, because it took place nearly one year before.

60.     The PDBR's decision to rely on the July 2004 examination (as well as the June 2004 exam, which did not indicate where in the range of motion pain began, and the February 2005 exam, which did not include a range of motion measurement) was arbitrary and capricious and contrary to law.  The available medical evidence, considered in its totality, including the December 2004 examination and the C&P examinations in August 2005 and March 2008, clearly established that a 40% rating was warranted.  The PDBR did not consider or explain all of the relevant evidence, and there was not substantial evidence to support its findings.  Additionally, contrary to the PDBR's assertion, the August 2005 C&P Examination, and the VA's subsequent use of this range of motion measurement, do not indicate that the examiner's range was insufficient for VASRD rating purposes.  Therefore, it was arbitrary and capricious and contrary to law for the PDBR to find that a 10% disability rating was appropriate.

61.     The examination undertaken closest in time to Ms. Thompson's separation from the Air Force supports a 40% disability rating, as do the totality of the other examinations conducted both before and after Ms. Thompson's separation.

62.     Ultimately, the PDBR rejected the range of motion finding made at the August 2005 C&P Examination based on an unfounded assumption without objective evidence.  The PDBR also cherry-picked the examinations that could have supported that rating.  As a result, the PDBR arbitrarily and capriciously deprived her of the designation and benefits to which she is entitled under law.

63.     On June 10, 2016, the Assistant Secretary of the Air Force, on behalf of the Secretary, accepted the PDBR's recommendation that Ms. Thompson's application be denied.

**THE PDBR'S DECISION THAT WAS ARBITRARY AND CAPRICIOUS, UNSUPPORTED BY SUBSTANTIAL EVIDENCE, AND CONTRARY TO LAW**

64.     As part of its review of the disability rating, the PDBR is required to follow the VASRD strictly.

65.     The PDBR's decision to uphold the PEB's 10% disability rating was arbitrary, capricious and contrary to law because it gave weight to inadequate examinations; those exams lacked any mention of where pain began or of the functional loss caused by such pain, and/or failed to mention range of motion at all.  Additionally, the PDBR's decision failed to properly analyze Ms. Thompson's other medical examinations supporting a disability rating of at least 40% for her back disability that contradicted the evidence relied upon by the PDBR for its findings.

66.     The PDBR also acted arbitrarily, capriciously, and contrary to law when it rejected the August 2005 C&P Exam in which Ms. Thompson presented with 30 degrees of forward flexion based on speculation that the C&P Exam's report of limitation of range of motion was "not useful" due to the back brace worn during the exam.  The PDBR's assertion ignores that the VA did in fact find that range of motion probative for VASRD purposes and that there is no evidence that the back brace affected Ms. Thompson's range of motion.  In fact, the PDBR's decision to use Ms. Thompson's back brace to discount the VA's range of motion measurements violates the mandate

set forth in 10 U.S.C. § 1216a(a)(2) that the military strictly follow the VASRD and only use additional criteria in making a rating where "such criteria will result in a determination of a greater percentage of disability than would be otherwise determined through the utilization of the schedule."  Further, the PDBR ignored pertinent information in the form of a December 13, 2004 opinion from a Pain Medical Clinic visit during which Ms. Thompson demonstrated 20 degrees of forward flexion.

67.     The PDBR concluded that its "[m]embers placed greater probative value on the orthopedic exams in June 2004 and February 2005 for its rating recommendation."  However, given that:

- the C&P Exam was closer in time to Ms. Thompson's separation than the July 2004 exam;

- the C&P Exam was closer in time to Ms. Thompson's separation than the June 2004 exam;

- the C&P Exam was corroborated by the December 2004 Air Force examination, which found that Ms. Thompson demonstrated 20 degrees of forward flexion;

- the C&P Exam was a more thorough and relevant examination than the July 2004 and February 2005 orthopedic examination because it actually included proper range of motion measurements and noted where pain began and the functional loss due to pain; and

- the VA determined that the C&P Exam was adequate for rating purposes such that if the back brace or aspects of the Exam were improper then the VA would have made such a finding and not relied upon the C&P Exam for rating purposes,

the PDBR's reliance on the June 2004, July 2004, and February 2005 examinations to the exclusion of the December 2004 and August 2005 examinations was arbitrary and capricious.  The PDBR did not rationally explain why it had credited those earlier examinations and discounted the latter ones.  Based on the available record before it, and the governing legal standard, the PDBR was obligated to overturn the PEB's decision and grant Ms. Thompson a 40% disability rating and medical retirement.

68.     The PDBR's contrary decision was arbitrary and capricious, unsupported by substantial evidence, and contrary to law because the PDBR failed to follow the requirements of the VASRD when deciding whether a 10% or 40% disability rating was appropriate for Ms. Thompson's back disability.   The rating criteria for the spine is based primarily on ROM measurements.  The record before the PDBR clearly established that, at the time of her separation, Ms. Thompson's ROM for her spine was 30 degrees or less, warranting a disability rating of 40% under 38 C.F.R. § 4.71a.  The VASRD requires that when reasonable doubt arises regarding the degree of disability, such doubt will be resolved in the favor of the veteran.  38 C.F.R. § 4.3.  Moreover, if there is a question as to which of two evaluations must be applied, the higher evaluation must be assigned if the disability picture more nearly approximates the criteria required for the higher rating. 38 C.F.R. § 4.7.

69.     In other words, the PDBR violated the VASRD and improperly failed to consider substantial evidence relating to Ms. Thompson's disability, including *inter alia* the Air Force examination on December 13, 2004 and the August 2005 and March 2008 C&P Exams, which both strongly support a disability rating of at least 40% under the VASRD.

70.     Had the PDBR and the Secretary properly applied the VASRD, Ms. Thompson would have received a disability rating of 30% or greater, which would have entitled her to permanent disability medical retirement.

### COUNT I: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (5 U.S.C. § 706(2)(A))

71.     Plaintiff incorporates the allegations in paragraphs 1 through 71 above.

72.     The PDBR acted arbitrarily and capriciously by affirming the flawed decision of the PEB and rendering a decision that was not well supported by the evidentiary record.  Instead, the PDBR relied on irrelevant facts and two limited examinations while ignoring other pertinent

facts and evidence that accurately show Ms. Thompson's disability picture, to support its decision that a 10% rating was more probative of Ms. Thompson's injury at separation than the VA's Rating Decision.

73.     The PDBR's decision is also contrary to law because it violates provisions of the VASRD, including 38 C.F.R. §§ 4.3, 4.4, 4.7, 4.59, and 4.71a.

74.     Ms. Thompson has suffered a legal wrong as a result of the PDBR's arbitrary and capricious decision, because she was deprived of her right to a meaningful review from the PDBR. The PDBR's incorrect decision caused Ms. Thompson to remain with the incorrect designation of medical separation from the Air Force.  As a result, Ms. Thompson was deprived of a discharge status that her serious disability and honorable service warrant: medical retirement.

75.     Ms. Thompson volunteered to serve our country in a time of great need.  She did so honorably, receiving commendations for her exemplary service.

76.     The PDBR exists to correct injustices by ensuring the accuracy and fairness of disability ratings.  The PDBR failed to meet that mission here, and the Secretary similarly erred by accepting that judgment.  Awarding Ms. Thompson medical retirement status would correct the injustice caused by the PDBR's arbitrary and capricious decision of approving the PEB's earlier determination.  Accordingly, Ms. Thompson should be awarded a medical retirement.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment against the Defendants and award the following relief:

a.     Find that the PDBR's determination, and the Air Force's decision to adopt the PDBR's determination, were arbitrary and capricious, unsupported by substantial evidence, and contrary to law;

b.     Issue an Order vacating the PDBR's determination and the Air Force's decision to adopt the PDBR's determination;

c.     Issue an Order to amend Ms. Thompson's records to reflect a disability rating of 40%;

d.     Issue an Order to amend Ms. Thompson's Air Force records—including without limitation her DD Form 214 and her retirement orders—to reflect a permanent medical retirement;

e.     Declare, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, that the PDBR has violated the Administrative Procedure Act;

f.     Award Plaintiff costs and attorneys' fees under 28 U.S.C. § 2412; and

g.     Grant any other relief the Court deems proper.

Dated: April 19, 2022

Respectfully submitted,

DECHERT LLP
/s/ Alexandre de Gramont

Rochelle Bobroff
(D.C. Bar No .420892)
rochelle@nvlsp.org
David Sonenshine
(D.C. Bar No. 496138)
david@nvlsp.org
Esther Leibfarth
(D.C. Bar No. 1016515)
esther@nvlsp.org
NATIONAL VETERANS LEGAL
SERVICES PROGRAM
1600 K Street, N.W., Suite 500
Washington D.C. 20006
Telephone:  (202) 621-5677
Facsimile:    (202) 328-0063

Steven A. Engel
(D.C. Bar No. 484789)
steven.engel@dechert.com
Alexandre de Gramont
(D.C. Bar No. 430640)
alexandre.degramont@dechert.com
DECHERT LLP
1900 K Street, NW
Washington, DC 20006-1110
Telephone:  (202) 261-3300
Facsimile:      (202) 261-3333

Paul Curran Kingsbery*
paul.kingsbery@dechert.com
Christine Isaacs*
christine.isaacs@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
Telephone:     (212) 698-3500
Facsimile:    (212) 698-3599

*Counsel for Plaintiff*

* Admission *Pro Hac Vice* Pending